UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
JAN X 2 2008
JAN 2 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | 07 CR **08CR 0002** |
| v. ) | |
| ) | Violations: Title 18, |
| ) | United States Code, |
| AQIL ALLAWI ) | Sections 1343 and 2 |

COUNT ONE

JUDGE GOTTSCHALL

The UNITED STATES ATTORNEY charges:

At times relevant to this Information:

MAGISTRATE JUDGE SCHENKIER

a. The United States Department of Agriculture ("USDA"), Food and Nutrition Service ("FNS"), was a federal agency responsible for the administration and implementation of the Food Stamp Program throughout the United States. The Food Stamp Program ("FSP") provided assistance to needy individuals in the form of food stamp coupons, and later through Electronic Benefit Transfers ("EBT"). The FSP participants in Illinois received an EBT card, also known as a "Link card," which was used to purchase approved food products at participating stores.

b. The Link card system was developed for Illinois to enable government agencies to deliver FSP benefits to recipients through the use of electronic transfers, much like debit and credit cards, to eliminate actual, hard copy food stamp coupons. The redemption aspect of the Illinois Link card system was operated under contract by Affiliated Computer Services, and its affiliates located in Austin, Texas.

c. To become eligible to participate in the FSP, candidate store owners in the Chicago area were required to complete, sign, and submit to the Chicago Field Office of the USDA-FNS an FSP Application for Stores, known as form FNS 252. Upon completion of the application process,

if the store and its owner(s) qualified, the store was authorized to participate in the program and to redeem food stamp benefits from USDA.

    d.    Authorized store owners were required to report to the USDA changes from the initial application in food sales, inventory, stock and size of the store, as well as changes of location, name, and ownership.

    e.    Authorized stores could lawfully only accept Link card benefits in exchange for eligible food items. Authorized stores were prohibited from accepting Link card benefits in exchange for items such as alcoholic beverages, tobacco, hot foods, ready-to-eat foods, lunch counter items, vitamins, medicines, or pet foods.

    f.    Authorized stores were prohibited from accepting Link card benefits in exchange for cash.

    g.    Prior to receiving authorization to participate in the FSP, the applicant store owner or his/her representative was required to participate in an interview conducted by the USDA. During the interview, the applicant store owner was informed of the prohibitions against accepting Link card benefits in exchange for cash and ineligible items.

    h.    When a store was authorized to participate in the FSP, the applicant was informed that the point-of-sale devices designed to accept Link cards were nontransferrable and could only be used at the authorized store for benefits exchanged at that location.

    i.    Through the Link card system, FSP benefits were automatically credited to the Illinois recipient's Link card each month. In order for recipients to access their electronic benefits to purchase eligible food items, they were required to present their Link card to a retailer authorized by USDA. Unauthorized retailers could not accept Link cards. The Link cards could only be processed

by a specially-provided and manufactured point-of-sale terminal designed to accept Link cards (hereinafter the "Link card machine"). After manually entering the information or "swiping" the Link card through the Link card machine, the food stamp recipient entered a personal identification number ("PIN") into the machine's keypad to complete the transaction. The Link card machine recorded the Link card account number, the date and time of the transaction, and the amount debited from the recipient's Link card.

j.  Once the necessary information was received by the Link card machine, it automatically called a 1-800 telephone number, which allowed the Link card machine to dial into Affiliated Computer Service's computer system located in Austin, Texas. Through this contact, the Link card transaction was either approved or rejected, and the result was then communicated to the Link card machine, again via the open phone line. If the Link card transaction was approved, Affiliated Computer Services would transfer or cause to be transferred funds from each redemption into the bank account of the authorized retailer to whom the Link card machine was registered. The transfer of funds into an account identified by the authorized retailer normally took place the next business day following the approved Link card transaction.

k.  In particular, at the end of the business day the computer system operated in Austin, Texas would total all approved transactions for each Illinois retailer during that retailer's designated business day. From that total an electronic Automated Clearing House ("ACH") file would be created containing the identification number, bank account number and routing number for the retailer's designated bank, a file header indicating that the file constituted an EBT payment, and the amount to credit. This file would then be sent electronically, by wire, from Austin, Texas to a bank

located within the State of Illinois. That bank would subsequently disburse the retailer's Link reimbursements.

l.  Defendant AQIL ALLAWI owned and worked at Maream Food Market ("Maream"), a neighborhood grocery store located at 4043 W. Madison, Chicago, Illinois.

m.  Individual A worked at Maream Food, recruited defendant ALLAWI to open Marcam, and was responsible for running its financial operations.

n.  On or about October 2, 2001, Individual A directed defendant ALLAWI to sign a USDA Food Stamp Application for Store and a Retailer Training Acknowledgment on behalf of Maream's which stated, in part, that: (1) ALLAWI had attended retailer orientation held by FNS and that the Food Stamp Program rules and regulations had been thoroughly reviewed; (2) ALLAWI understood that exchanging cash for food stamp benefits was illegal and could result in permanent disqualification from the Food Stamp Program as well as criminal prosecution; and (3) it was ALLAWI's responsibility to ensure that all full-time and part-time employees were properly instructed regarding the Food Stamp Program regulations.

In addition, on the application, Individual A through defendant ALLAWI represented and caused to be represented to the USDA, among other things, that: (1) Maream's was a privately-owned company, owned and managed by defendant ALLAWI; (2) defendant was owner/president of Maream's; (3) the estimated annual gross sales at Maream's were $350,000; and (4) estimated food stamp eligible sales were $250,000 per year.

o.  On March 21, 2002, Maream was authorized to participate in the Food Stamp Program and to redeem food stamp benefits and received a USDA authorization number. Defendant and

Individual A, through the operation of Maream, obtained the use of the Link machine that was assigned to Marcam.

p.  From or about March 2002 and continuing through December 2002, defendant maintained two bank accounts for Maream at TCF Bank in Chicago, Illinois, which defendant designated as the accounts for the purpose of receiving electronic transfers of reimbursements for the EBT benefit redemptions. Defendant was an authorized signatory on the bank accounts.

q.  From on or about May 17, 2002 through on or about December 5, 2002, Maream redeemed a total of approximately $504,000 in Link card food stamp benefits.

2.  Beginning in or around October 2001 and continuing until in or around December 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

## AQIL ALLAWI,

defendant herein, along with Individual A and others, knowingly devised, intended to devise and participated in a scheme to defraud and to obtain money and property from the USDA, by means of materially false and fraudulent pretenses, representations, and promises, which scheme is further described below.

3.  It was a part of the scheme that Individual A recruited defendant ALLAWI to be the owner of record for Maream, and further caused the defendant to open Marcam in his name, and to sign FSP Applications for Marcam for filing with the USDA so that the store would be authorized to redeem Link card benefits.

4.  It was a further part of the scheme that defendant ALLAWI completed an application for Maream to participate in the FSP in order to redeem Link card benefits.

5. It was further part of the scheme that on multiple occasions during the course of the scheme, Individual A and others, with the knowledge, assistance and consent of defendant ALLAWI, knowingly used, and caused to be used, the Link card machine from Maream to process fraudulent Link card transactions in which Individual A, with the knowledge, participation and cooperation of defendant ALLAWI, redeemed and caused to be redeemed Link card benefits in exchange for discounted amounts of cash knowing that such exchanges were prohibited under the FSP. Individual A and defendant ALLAWI's scheme caused a loss to the USDA of at least $350,000.

6. It was further part of the scheme that defendant ALLAWI, Individual A and others, caused Affiliated Computer Services and its affiliates to wire transfer to the bank accounts designated for Maream, reimbursements received for fraudulently redeemed Link card food stamp benefits.

7. It was further part of the scheme that beginning in or about May 2002 and continuing until in or about December 2002, defendant ALLAWI, Individual A and others, received sums of money for the redemption of Link card food stamp benefits and used and caused to be used portions of these funds to purchase additional food stamp benefits at a discounted rate.

8. It was further part of the scheme that defendant ALLAWI opened and controlled, and had access to, the bank accounts for Maream, and from those accounts, personally cashed checks and signed blank checks that were cashed by Individual A, for the purpose of continuing the purchases of Link card benefits at a discounted rate.

9. It was further part of the scheme that on or about December 3, 2002, at Maream, Individual A or others known to defendant, with the knowledge, assistance and consent of defendant

ALLAWI, knowingly redeemed benefits from a Link card in the amount of $181.25 in exchange for the payment of approximately $110.00 in U.S. currency to Card-holder One.

10. It was further part of the scheme that defendant ALLAWI misrepresented and concealed and caused to be misrepresented and concealed the purposes of, and the acts done in furtherance of, the scheme in order to avoid detection of the scheme.

12. On or about December 5, 2002, at Chicago, in the Northern District of Illinois, Eastern Division,

AQIL ALLAWI,

defendant herein, for the purpose of executing the above-described scheme, knowingly caused to be transmitted, and aided and abetted the transmission, by means of wire communication in interstate commerce from Austin, Texas to Chicago, Illinois, certain signs, signals and sounds, namely: an electronic funds transfer in the amount of $7,063.16 to TCF Bank, Chicago, Illinois, for deposit into the Maream account;

In violation of Title 18, United States Code, Sections 1343 and 2.

_____
UNITED STATES ATTORNEY